E-FILED
Tuesday, 28 September, 2010  11:28:54 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| CHARLENE MADLOCK, as Administrator of the Estate of James Lee, deceased; and JESSICA FLOWERS,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF PEORIA, POLICE OFFICER JOHN PETERSON, and POLICE OFFICER ROBERT MCMILLEN,<br><br>Defendants. | Case No.   08-cv-1117 |

## O R D E R  &  O P I N I O N

This matter is before the Court on Defendants John Peterson and Robert McMillen's ("Defendant Officers") Motion for Summary Judgment (Doc. 30), as well as Defendant City of Peoria's ("Defendant City's") Motion for Summary Judgment (Doc. 33).  Plaintiffs timely filed their Response to Defendant Officers' Motion for Summary Judgment (Doc. 36), to which the Defendant Officers filed a Reply (Doc. 37).  Plaintiffs did not respond to Defendant City's Motion for Summary Judgment. For the following reasons, Defendant Officers' Motion is GRANTED in part and DENIED in part, and Defendant City's Motion is GRANTED.

### INTRODUCTION

This lawsuit stems from the shooting death of James Lee.  Lee was shot and killed by Defendant Officer Robert McMillen on the morning of April 26, 2007, while McMillen was responding to a reported domestic dispute.  Charlene Madlock, one of

the Plaintiffs, is Lee's mother and is suing in her capacity as Administrator of his estate. Jessica Flowers, the other Plaintiff, was Lee's girlfriend on the night of his death and was also injured when Officer McMillen fired upon Lee.

Madlock has brought suit pursuant to 42 U.S.C. § 1983 against Officer McMillen, Officer Peterson (who was also on the scene on the morning of April 26, 2007), and the City of Peoria to recover civil damages (Counts III and IV).[1] In addition to her § 1983 claims, Madlock has brought supplemental state-law claims pursuant to the Illinois Wrongful Death Act, 740 Ill. Comp. Stat. 180/1 et. seq., (Count I), and the Illinois Survival Act, 755 Ill. Comp. Stat. 5/27-6 (Counts II and V). Plaintiff Flowers has also brought state-law claims against Officer McMillen and Officer Peterson for battery (Count VI), assault (Count VII), and negligence (Count VIII).

## FACTUAL BACKGROUND[2]

Plaintiff Jessica Flowers lived with James Lee at 2200 West Krause Street, Peoria, Illinois. (Doc. 36 at 1). On the late evening of April 26 and early morning of April 27, 2007, the two began to argue. (Doc. 36 ¶ 14). Close to midnight, when Lee

---

[1] It has already been disputed in this Court whether Plaintiffs' claim against City of Peoria is based upon § 1983 or a state-law cause of action. While Plaintiff labels Count IV as a *Monell* Claim, which implies that it is pursuant to § 1983, she also alleges that under the Illinois Survival Act Lee's Estate is entitled to civil damages for Defendants' tortious conduct and prays that this Court "find that the City of Peoria is liable for the willful and wanton acts of its employees," implying that she is seeking to recover from the City based upon a *respondeat superior* theory of state-law tort liability. Plaintiffs had an opportunity to brief this issue earlier in these proceedings with regards to seeking remand to state court, and failed to convince this Court that they were not alleging a §1983 claim. (Doc. 7).

[2] These background facts reflect the Court's determination of the undisputed facts, unless otherwise noted. Facts that are omitted are immaterial; if an included fact is immaterial to the Court's determination, this will be noted.

went into another room, Flowers called 911 and asked for the police to come to her residence because her boyfriend was "trying to fight" with her. (Doc. 36 ¶ 20). Upon Lee's return to the room, Flowers hid the phone under her pillow so that Lee would not know she had called the police; she left the phone on, however, allowing the dispatcher to hear what was happening in the home. (Doc. 36 ¶ 22). Over the course of the next five minutes, the dispatcher could hear loud screams and crying. (Doc. 30 ex. 5).

As the fight continued, Flower's daughter woke up and started to cry. (Doc. 36 ¶ 28). Flowers asked Lee to leave, but he said that "he wasn't going anywhere and she wasn't going anywhere." (Doc. 36 ¶ 32). He did, however, tell her to take her daughter to another room so she would stop crying. (Doc. 36 ¶ 33). While Flowers was walking down the hallway holding her daughter, Lee was taking pictures off the wall and throwing and breaking them, leaving blood in the hallway. (Doc. 36 ¶ 35). Lee also threw a pistol at Flowers, which hit her in the back of the head. (Doc. 36 ¶ 36).

While this was going on inside of the home, Peoria police officers were arriving to the scene in response to Flowers' 911 call. Officers Peterson and McMillen were dispatched to the residence, being informed that there was a female having trouble with a male and that it seemed as though the male was right next to the female so that she couldn't talk. (Doc. 36 ¶¶ 78-80). The Officers were also told that Dispatch could hear a female screaming and a baby crying in the background. (Doc. 36 ¶ 82).

Officer Peterson was the first to arrive on the scene. (Doc. 36 ¶ 81). He immediately approached the house, and could hear yelling and banging noises coming from inside the residence. (Doc. 36 ¶ 88). Because Peterson believed that things inside were getting violent, he called for a third car to handle the situation. (Doc. 36 ¶ 89). At that time, Officer McMillen arrived and met Officer Peterson in the front yard. (Doc. 36 ¶ 92). The two Officers then entered an enclosed porch in front of the house and stood outside of the front door. (Doc. 36 ¶94).

There is a dispute between the parties regarding whether or not Officer Peterson could see into the home from this vantage point in front of the doorway. According to Defendants, Peterson was able to "see somewhat what was going on in the house" through a break in the blinds on the front door window. (Doc. 30 ¶ 95). Peterson says that he saw a female and a male, and that he heard the female saying that she wanted to leave, to which the male responded "You're not going anywhere." (Doc. 30 ¶ 97). Plaintiffs, on the other hand, say that it is impossible for Officer Peterson to have seen into the home. They point to evidence in Flowers' Deposition indicating that the front door had blinds on it that were relatively new, that these blinds were closed on the night of the incident, and that you couldn't see through the blinds while they were closed. (Doc. 36 ¶ 95). Further, Plaintiffs dispute whether Lee told Flowers "You're not going anywhere," because this was not recorded by Dispatch on Flowers' 911 call. (Doc. 36 ¶ 95).

Whether or not Officer Peterson could see into the home, the parties do not dispute that shortly after entering the porch, Officer Peterson attempted to enter the house, but upon discovering that the door was locked resorted to knocking.

4

(Doc. 36 ¶ 99). Inside, Lee and Flowers heard the knock and raced one another to the door. (Doc. 36 ¶¶ 38-42). Although Flowers started towards the door first, Lee, with a gun in his hand, grabbed her by the back of the shirt so that she could not answer it. (Doc. 36 ¶ 39-41). Having held Flowers back so that he could beat her to the door, Lee pulled the blinds down to see outside. (Doc. 36 ¶ 44). As there were two lights on inside and it was dark on the porch, Lee couldn't see anything through the window and opened the door an inch or two. (Doc. 36 ¶¶ 46-48). When Lee opened the door, Officer Peterson stepped into it to try to gain access to the house. (Doc. 36 ¶ 102). Lee immediately tried to shut the door, and, with his left shoulder against it, squatted down and tried to push it closed. (Doc. 36 ¶¶ 51-52, 102-104). At the same time, Flowers was trying to pull the door open from the inside. (Doc. 36 ¶ 53).

The whole time this struggle to open the door was taking place, Lee had the gun in his right hand. (Doc. 36 ¶¶ 49, 52). As soon as Officer Peterson saw the gun, he stepped back and the door closed. (Doc. 36 ¶ 106-107). While Peterson was informing McMillen that the man inside had a gun, Lee slid the gun under a couch next to the door. (Doc. 36 ¶¶ 55, 108).[3] Outside, Officer McMillen pointed his gun at the door and said "Put your hands up. Put your hands up." (Doc. 36 ¶ 113). After getting confirmation from Officer Peterson, McMillen aimed at the center of Lee's

---

[3] At this time, Defendants say that Officer McMillen saw Lee grab Flowers by the neck. Plaintiffs argue that Lee was still bending down to throw away the gun when he was shot, and thus it is not possible for Officer McMillen to have seen Lee assault Flowers. Plaintiffs point to the testimony of Flowers, as well as an autopsy report that indicates Lee was bent over when he was shot. (Doc. 36 ¶ 20). Thus, there is a genuine dispute as to this issue. However, as will be discussed below, it is not material because, even assuming Plaintiff's version of the story is true, Defendants are entitled to judgment as a matter of law.

5

chest and fired two shots. (Doc. 36 ¶¶ 116-119). Both of the bullets struck Lee, with one entering his shoulder and the other entering his chest. (Doc. 36 ¶ 132). Either would have been fatal. (Doc. 36 ¶ 133). In addition to hitting Lee, one of the bullets fired by McMillen pierced Flowers' right hand as she had been reaching across Lee's body to push her three year old daughter away from Lee's back. (Doc. 36 ¶¶ 58-59).

### LEGAL STANDARD

Summary judgment should be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. In ruling on a motion for summary judgment, the court must view the evidence on record in the light most favorable to the non-moving party. *SMS Demag Aktiengesellschaft v. Material Sciences Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). All inferences drawn from the facts must be construed in favor of the non-movant; however, the court is not required to draw every conceivable inference from the record. *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009). The court draws only reasonable inferences. *Id.*

It is not the court's function to scour the record in search of evidence to defeat a motion for summary judgment. Instead, the court relies on the non-moving party to identify the evidence which creates an issue of triable fact. *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (*quoting Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001). If the evidence on record could not lead a reasonable jury to find for the non-movant, then no genuine issue of material fact exists and the

movant is entitled to judgment as a matter of law. *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997). At the summary judgment stage, however, the "court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts," such matters must be left for the jury. *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007).

**DEFENDANT OFFICERS' MOTION FOR SUMMARY JUDGMENT**

**I. Plaintiff's Count III: Defendant Officers' Excessive Use of Force Against Lee**

Plaintiff alleges that Officers Peterson and McMillen used excessive force against Lee in violation of the Fourth and Fourteenth Amendments. (Doc. 1 at 7-8). Defendants argue that the Officers did not violate Lee's Fourth Amendment rights because the deadly force used against him was objectively reasonable under the totality of the circumstances. (Doc. 30 at 16).

Plaintiff's § 1983 claim arises under the Fourth Amendment's prohibition against unreasonable seizures. "A police officer's use of deadly force is a seizure within the meaning of the Fourth Amendment and accordingly must be reasonable." *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002). In this context, the reasonableness inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The Court must take the "perspective of a reasonable officer on the scene," and consider "the amount and quality of information known to the officer at the time he fired the weapon." *Muhammed*, 316 F.3d at 683. It must also remember that "police officers are often forced to make split-second judgments—in

7

circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. *Graham*, 490 U.S. at 397. If the officers had probable cause to believe that the suspect posed a threat of death or serious injury to himself or others, then their use of deadly force was objectively reasonable. *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) (*citing Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985). Further, "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used to prevent escape." *Garner*, 471 U.S. at 11.

The Defendant Officers argue that even under Plaintiff's version of the events that took place on the night of April 26, 2007, the facts and circumstances as known by Officers Peterson and McMillen would make an objectively reasonable police officer believe that Lee posed a threat of death or serious injury to himself, Flowers, or Flowers' children. (Doc. 30 at 19). The Court agrees. Because there is no evidence in the record that could make a reasonable jury find for Plaintiff on the § 1983 claim on behalf of Lee's Estate, judgment for Defendant Officers is proper as a matter of law.[4]

According to Plaintiffs, here is the situation that Officers Peterson and McMillen were presented with on the night in question:[5] A woman had called the

---

[4] Plaintiffs are correct that there are genuine disputes regarding how well the Officers could see into the home and whether or not Lee grabbed Flowers by the neck. However, even if these disputes are resolved in favor of the Plaintiffs, the Defendant Officers were still justified in their use of deadly force.

[5] In determining whether the Officers were objectively reasonable, all that matters is what they knew or were presented with, not what was actually occurring inside of the home.

police to report a fight with her boyfriend; she could not talk to the dispatcher as soon as her boyfriend returned to the room; however, the telephone was left on and the receiver secreted underneath a pillow to allow the police dispatcher to hear what was transpiring: there were sounds of screaming and a baby crying coming from inside the home, in addition to loud banging noises and shouts;[6] the incident sounded so violent that Officers Peterson and McMillen decided to approach the home together and call a third car to go around the back; when they attempted to enter the front of the residence, the door was locked; upon knocking, the male peeked out the window and then opened the door with a gun in his hand; the officers fought to get in and the female struggled to open the door from the inside; the male succeeded in closing the door, and locked himself back inside with the gun, the female, and her children. Further, there is no dispute that the Officers warned Lee to put his hands up before they opened fire. (Doc. 30 Ex. 5).

According to the Seventh Circuit, "a reasonable belief that danger exists may be formed by reliance on appearances." *Ford*, 855 F.2d at 1275. Based upon the above facts, which are not disputed by Plaintiffs, the appearance was that Lee, while in the midst of a loud and violent confrontation with his girlfriend, had a gun in his hand and was resisting arrest. Further, it was reasonable for the Officers to believe that he appeared to pose a risk of serious harm to his girlfriend and/or her children, as the girlfriend had called the police for assistance, had been screaming and crying, was trying to open the door to let the police in, and was now locked inside with Lee, who had a gun. Given the few seconds within which the Officers

---

[6] This evidence is also corroborated by the recording of the 911 call, which is also before the Court.

had to make their decision, it was not unreasonable for them to believe that deadly force was necessary. *See Graham*, 490 U.S. at 397.[7]

In *Ford*, the Seventh Circuit found that it was reasonable for police officers to use deadly force to stop a suspect who was fleeing a bank robbery. 855 F.2d 1275. The court based its decision on the fact that Ford posed a threat of serious physical harm to the police or others. *Id.* at 1276. In that case, the suspect was running down the street, away from the place he had committed a crime, and the police had not actually seen him carrying a weapon. *Id.* at 1275. Here, Officer Peterson saw a gun in Lee's hand, and Lee subsequently locked himself inside of his home with the woman who called the police on him and her children. If it was reasonable for the police in *Ford* to believe that the suspect posed a serious risk of harm to others as he was running down the street, away from his crime, it was just as reasonable for Officers Peterson and McMillen to believe that Lee posed a serious risk of harm to the woman at whom he was screaming and throwing things, and who he wouldn't let out of the home.[8]

Because, based upon the evidence as presented by the Plaintiffs, the Defendant Officers were objectively reasonable in their use of deadly force, they did

---

[7] Plaintiffs also dispute whether or not the Officers reasonably feared for their own lives and/or safety. While Defendant is correct that this is an objective test rather than a subjective one, the Court finds that it is not relevant here. The Officers need only have a reasonable belief that the suspect poses a serious threat to themselves *or others*. *See Sherrod*, 856 F.2d at 805. Because it was reasonable for the Officers to believe that Lee posed a serious threat to Flowers and her children, the Court need not determine whether or not it would have been reasonable to believe that they themselves were in danger.

[8] In fact, while it is irrelevant to the Officer's perceptions at the time of the incident and thus not material to this Court's determination, it is undisputed that Lee had already held the gun up to Flower's head inside the home and threatened to kill her. (Doc. 36 ¶¶ 29-30).

not violate Lee's Fourth Amendment rights and are entitled to judgment as a matter of law.[9] Accordingly, Defendant Officers' Motion for Summary Judgment is GRANTED with regard to Count III.

## II. Plaintiffs' Counts I, II, and V: State-Law Claims on Behalf of the Lee Estate

Because the Defendant Officers were reasonable in using deadly force against Lee, they are also entitled to summary judgment on the other state-law claims brought by the Lee Estate.

Count I is a wrongful death claim brought pursuant to 740 Ill. Comp. Stat. 180/1. The Illinois statute provides that a person's estate may recover when that person dies due to a "wrongful act, neglect, or default." Thus, in order to recover, Plaintiffs must show that there was a wrongful act committed on the part of the Defendant Officers. Illinois law also provides that a police officer may use deadly force if he "reasonably believes that such force is necessary to prevent death or great bodily harm to himself or [another] person." 720 Ill. Comp. Stat. 5/7-5. Because this Court has determined that Officers Peterson and McMillen were reasonable in their belief that Lee posed a risk of death or great bodily harm to Flowers and her children, there was no wrongful act upon which liability can be based. *See Taylor v. City of Chicago*, No. 01-cv-2057, 2003 WL 22282386 at *6 (N.D. Ill. 2003) (holding that when an officer's use of deadly force was justified under federal constitutional law, it was also justified under Illinois state law).

---

[9] The Defendants argue in the alternative that they are entitled to summary judgment based upon qualified immunity. However, because the Court finds that the Officers actions did not violate the Fourth Amendment, there is no need to consider the second prong of the *Saucier v. Katz*, 533 U.S. 194 (2001) qualified immunity analysis.

In Counts II and V, Madlock, on behalf of Lee's Estate, brings claims against the Defendant Officers for assault and battery. Like the claim for wrongful death discussed above, these claims also fail because Officers Peterson and McMillen were objectively reasonable in their use of deadly force against Lee, and are therefore not liable to Lee's Estate for their justified actions. *See Soriano v. Town of Cicero*, No. 05-cv-774, 2010 WL 3418260 (N.D. Ill. 2010). Accordingly, Defendant Officers' Motion for Summary Judgment is GRANTED with regards to Counts I, II, and V.

### III. Plaintiffs' Counts VI and VII: Plaintiff Flower's Assault and Battery Claims

In Counts VI and VII, Plaintiff Flowers brings claims of assault and battery against Officers Peterson and McMillen. In both counts, Flowers bases her theory of recovery upon the doctrine of transferred intent.[10] As discussed above, the Defendant Officers were justified in their intent to fire upon Lee because they had probable cause to believe that he posed a serious risk of danger to Flowers and her children. Accordingly, they cannot be held liable to Flowers for either battery or assault as they were justified in their intent to fire upon Lee. Therefore, Defendants' Motion to for Summary Judgment is GRANTED with regards to Plaintiff's Counts VI and VII.

---

[10] With regards to her battery claim, Flowers alleges that "Officers Peterson and McMillen willfully, wantonly, and intentionally discharged their firearms at James Lee with the intent to cause an unauthorized touching" and that their "intent to shoot Mr. Lee was transferred to Ms. Flowers because the intentional discharge of their firearms at Mr. Lee caused an unauthorized touching of Ms. Flowers." (Doc. 1 at 10). Likewise, as part of her assault claim, she alleges that "upon information and belief, the officers intended to place James Lee in apprehension of receiving a battery. In doing so, the officers' intent was transferred to Ms. Flowers as she was placed in reasonable apprehension of receiving a battery." (Doc. 1 at 11).

## IV. Plaintiffs' Count VII: Plaintiff Flower's Negligence Claim

In Count VIII, Flowers brings a negligence claim against Officers Peterson and McMillen, alleging that they did not "exercise caution or care when they willfully and wantonly began to shoot through a closed door at Ms. Flowers home." Under the Illinois Tort Immunity Act, police officers are protected from liability for an act or omission in the execution or enforcement of any law unless their act constitutes willful and wanton conduct. 745 Ill. Comp. Stat. 10/2-202. Willful and wanton conduct is defined as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others." 745 Ill. Comp. Stat. 10/1-210.

In *Glover v. City of Chicago*, 436 N.E.2d 623, 630 (Ill. App. 1982), the First District Illinois Appellate Court found that whether police officers engaged in willful and wanton conduct when they fired a gun into a closed door of an apartment they knew to be occupied was a question that was best left for the jury. Here, it is disputed how well Officer McMillen could see into Flowers' residence before firing his weapon. If, as Plaintiffs argue, the blinds were closed and difficult to see through when closed, then Officer McMillen may have been firing through the window without regard for the risk of harm posed to Flowers. Accordingly, this issue is not fit for resolution at the summary judgment stage, and Defendant Officers' Motion to Dismiss with regards to Count VIII is DENIED.

### DEFENDANT CITY OF PEORIA'S MOTION FOR SUMMARY JUDGMENT

As this Court has determined that Officers McMillen and Peterson did not violate Lee's Fourth Amendment rights, neither could have the City of Peoria.

13

Based upon this fact alone, Defendant City's Motion for Summary Judgment is GRANTED. Even had this Court found that there was a triable issue of genuine fact regarding whether Officers McMillen and Peterson violated Lee's Fourth Amendment rights, however, Defendant City's Motion would still be granted.

In its Motion for Summary Judgment (Doc. 33), Defendant City of Peoria argues that Plaintiffs have failed to show any evidence which would establish municipal liability against them pursuant to § 1983. In order to establish municipal liability against Defendant City of Peoria under § 1983, Plaintiff must show that one of its policies violated his individual rights. *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995). Plaintiff can show this in one of three ways: 1) the City has an "express policy that, when enforced, causes a constitutional deprivation;" 2) there is "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law;" or (3) a person with "final policymaking authority" for the City has caused the constitutional injury. *Id*.

According to Defendant City of Peoria, Plaintiffs do not assert a claim that the City has an express policy which caused the shooting, nor that the decision to shoot Lee was made by someone with final policymaking authority. (Doc. 33 at 3). Further, Defendants argue that Plaintiffs have not put forth sufficient evidence to show that the City had a custom or practice or using deadly force contrary to the commands of the Fourth Amendment. (Doc. 33 at 4).

While Plaintiffs filed a Response to Defendant Officers Motion for Summary Judgment (Doc. 36), they did not file a response to Defendant City's Motion, nor do

they respond to Defendant City's Motion in their Response to Defendant Officers'. Local Rule 7.1(D)(2) states that, in the context of a motion for summary judgment, "A failure to respond will be deemed an admission of the motion." Accordingly, because Plaintiffs have not responded to Defendant City of Peoria's Motion to Dismiss, Defendant City's version of the undisputed material facts is deemed admitted. Within these facts, the Court can find no evidence of any unofficial policy to violate persons Fourth Amendment rights. Because Plaintiffs have failed to put forward the requisite evidence to establish municipal liability pursuant to § 1983, Defendant City of Peoria's Motion is GRANTED.

## Conclusion

Defendant Officers' Motion for Summary Judgment is GRANTED in part and DENIED in part. It is GRANTED as to Counts I, II, III, V, VI, and VII. It is DENIED as to Count VIII. Defendant City's Motion for Summary Judgment as to Count IV is GRANTED. Because Count VIII is the only claim remaining and is based wholly on state law, Count VIII is REMANDED to the Peoria County Circuit Court.[11] IT IS SO ORDERED.

---

[11] In the Seventh Circuit, it is the usual practice of courts to relinquish jurisdiction over state supplemental claims when all federal claims have been dismissed prior to trial. *Wright v. Associated Ins. Co.*, 29 F.3d 1244, 1251 (7th Cir. 1994). There is an exception to this rule in cases where "it is absolutely clear how the pendent claims can be decided," which is why the Court retained jurisdiction over and ruled on Plaintiff's Counts I, II, V, VI, and VII, as the Court's decision that the Defendant Officer's use of force was objectively reasonable foreclosed Plaintiffs' recovery on those claims. *See id.* ("If the district court, in deciding a federal claim, decides an issue dispositive of a pendent claim, there is no use leaving the latter to the state court.").

Entered this 28th day of September, 2010.

>                                    s/ Joe B. McDade
>                                   JOE BILLY McDADE
>                             United States Senior District Judge